UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESSE EDEN,

               Plaintiff,               Civil Action No. 22-11515

v.                                 George Caram Steeh
                                 United States District Judge

NICOLE KEINATH, *et al.*,          David R. Grand
                                 United States Magistrate Judge

               Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 35)

On June 27, 2022, *pro se* plaintiff Jesse Eden ("Eden"), an incarcerated person currently confined at the Handlon Correctional Facility in Ionia, Michigan, filed this civil rights action pursuant to 42 U.S.C § 1983. (ECF No. 1). Named as defendants in this action are a John Doe jail deputy, as well as six other current or former employees of the Sanilac County Jail ("SCJ"): Lieutenant Nicole Keinath, former Deputy Cody Abrego,[1] and jail Sergeants Monique Tank, John Darling, Aaron Morden, and Tracy Kensley (collectively, "Defendants"). (ECF Nos. 1, 7).

At the time of the events at issue in the operative complaint, Eden was a pretrial detainee confined at the SCJ in Sandusky, Michigan. Broadly speaking, as construed by

---

[1] During the relevant time period, the SCJ employed both defendant Deputy Cody Abrego and Deputy Kyle Abrego (who is not a defendant in this matter). Unless otherwise indicated, references to "Defendant Abrego" will be to defendant Deputy Cody Abrego.

the Honorable George Caram Steeh, Eden brings a Fourteenth Amendment[2] cruel and unusual punishment claim against Defendants, alleging that he was sexually assaulted by a John Doe jail deputy defendant on or about February 16 or 17, 2022.  (ECF No. 8).  Eden further alleges that Defendants retaliated against him, in violation of the First Amendment, for attempting to identify, report, and pursue a claim against John Doe for this alleged sexual assault.  (*Id.*).  Additionally, Eden alleges that some or all of the named defendants took the following actions, which violated the First and/or Fourteenth Amendment: they (1) did not allow him to file grievances or complaints regarding the alleged sexual assault; (2) refused to provide information regarding the identity of the John Doe defendant; (3) placed him in a cell not covered by security cameras; (4) removed his mattress and blanket from his cell; (5) kept him in his cell for 25½ consecutive hours every other day; (6) denied him visitation; and (7) punched him in the face.  (*Id.*).

Now pending before the Court is Defendants' Motion for Summary Judgment, which was filed on October 6, 2023.  (ECF No. 35).  Eden filed responses to Defendants' motion on October 20, 2023 (ECF No. 37) and November 21, 2023 (ECF No. 39).  Defendants did not file a reply brief.

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody.  *See* E.D. Mich. LR 7.1(f).  Here, the Court finds that the facts and legal

---

[2] Although Eden references the Eighth Amendment in his complaint when alleging cruel and unusual punishment (ECF No. 1, PageID.1), such a claim should have been brought under the Fourteenth Amendment, as Eden was a pretrial detainee at the time of the events in question.  *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (explaining that the Eighth Amendment forbids cruel and unusual punishment of convicted prisoners, whereas the Fourteenth Amendment provides analogous protections to a pretrial detainee).

issues are adequately presented in the parties' briefs and on the record, and it declines to order a hearing at this time.

## I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(ECF No. 35)** be **GRANTED IN PART** and **DENIED IN PART**.

## II.     REPORT

### A.      Factual Background

#### 1.      *Eden's Arrest and Background Information About the SCJ*

On February 16, 2022, Eden was arrested and placed in the SCJ, where he remained for a period of approximately 11½ months, until he entered the state corrections system on January 27, 2023.  (ECF No. 35-2, PageID.218-19).  He currently is incarcerated at the Handlon Correctional Facility, serving a sentence of 6-20 years for three felonies.[3]

The SCJ is located in a two-story building with a holding area on the first floor, where there are five holding cells, and six housing pods/cell blocks on the second floor that are designated "A" through "F."  (*Id.*, PageID.229; ECF No. 35-3, PageID.316).  According to Lieutenant Keinath, on a normal twelve-hour shift, there is a single sergeant and four (4) deputies that are responsible for the roughly 130 inmates housed at the jail.  (ECF No. 35-3, PageID.316).  One deputy is assigned to the holding area on the first floor, where there are five holding cells; one deputy is assigned to the master control room; and two deputies are assigned to handle cell checks on the second floor where the housing units are located,

---

[3] *See* https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=358966 (last accessed April 15, 2024).

respond to inmate requests, and handle inmate transfers or other inmate issues.   (*Id.*).

During his stay at the SCJ, Eden was classified as "medium security" and was housed in

most of the cell blocks at various times.   (ECF No. 35-2; PageID.230; ECF No. 35-9).

Defendants were all employees of the SCJ at the time of Eden's incarceration there.   (ECF

No. 35-3, PageID.316; ECF No. 35-4, PageID.321; ECF No. 35-5, PageID.326; ECF No.

35-6, PageID.330; ECF No. 35-7, PageID.333; ECF No. 35-8, PageID.336).

SCJ inmates are allowed to communicate with jail and medical staff, as well as file

grievances, via an electronic message system referred to as a "kite."   As an inmate, Eden

used this system on hundreds of occasions, including to file 41 separate grievances.   (ECF

No. 35-10; ECF No. 35-3, PageID.316; ECF No. 35-11).   SCJ inmates also have two

separate means of communicating electronically with individuals outside of the jail via use

of a tablet or kiosk located in the common areas of the pods.   (ECF No. 35-2, PageID.236).

Eden sent and received thousands of emails during his time at the SCJ.   (*Id.*, PageID.237;

ECF No. 35-13).   The SCJ does not allow in-person social visits, but it allows inmates to

conduct video visits with friends and family outside of the jail, a system Eden also used, in

addition to traditional telephone calls.   (ECF No. 35-2, PageID.262).

### 2. *Eden's March 22, 2022 PREA Complaint*

Upon entry into the SCJ at 8:21 a.m. on February 16, 2022, Eden was initially held

in the intake area; on February 17, 2022, at approximately 10:23 p.m., he was transferred

to "D" cell block.   (*Id.*, PageID.231; ECF No. 35-9, PageID.339).   During that time, Eden

reported to jail medical staff that he was recovering from alcohol and methamphetamine

use and asked to be allowed to see Sanilac County Community Mental Health ("CMH"). (ECF No. 35-2, PageID.233; ECF No. 35-16, PageID.418).

SCJ records show that, at 9:56 a.m. on February 18, 2022, Eden was taken from "D" block to the holding area by Deputies Kyle Abrego and Nate Willing for a visit with CMH. (ECF No. 35-17; ECF No. 35-19). Because Eden had reported the possibility of self-harm, he was "changed out" into a green gown in a change-out room on the first floor before being escorted to the holding area.[4] (ECF No. 35-2, PageID.231, 233; ECF No. 35-18).

Immediately after the change-out, Eden was seen by a CMH clinician. During this visit, Eden did not indicate he was suicidal, nor did he allege that he had been sexually assaulted during the change-out (as he now claims). (ECF No. 35-20; ECF No. 35-2, PageID.233). After the visit with CMH, Eden was transferred to F-Pod, where he remained until March 26, 2022. (ECF No. 35-9). Between February 18, 2022, and March 22, 2022, Eden filed eleven separate grievances but none of them mentioned an alleged sexual assault, let alone a specific violation of the Prison Rape Elimination Act ("PREA"). (ECF No. 35-11). Similarly, between March 18, 2022, and March 21, 2022, Eden sent numerous messages to his girlfriend in which he complained about various issues at the prison, while making no mention of an alleged sexual assault. (ECF No. 35-13, PageID.388-96).

---

[4] At his deposition, Eden testified that, although he knows most – if not all – of the SCJ deputies by sight, given his many incarcerations at the SCJ, he could not say who changed him out, and he claims it was one person, not two. (ECF No. 35-2, PageID.231, 234). Eden also maintains that he was changed out on February 17, 2022 (*Id.*, PageID.247), while SCJ records indicate that the move occurred on February 18, 2022 (ECF No. 35-17; ECF No. 35-19).

On the morning of March 22, 2022, Eden submitted a PREA Incident Form.[5]  (ECF No. 35-12).  In this submission, Eden provided no details of an alleged sexual assault, and instead merely indicated that he was reporting "Misconduct" and was "to[o] afraid to put in a form.  [P]lease keep me in F pod where there are cameras and people to witness my safe being.  [I']ve been asking to speak with the [M]ichigan state police and am repeatedly denied."  (*Id.*).  Despite the lack of detail, Lieutenant Keinath reported the matter to the Sanilac County Detective Bureau for investigation that same day, and Detective Wendling was assigned to investigate.  (ECF No. 35-3, PageID.316; ECF No. 35-18).

On March 31, 2022, Detective Wendling conducted a recorded interview with Eden; according to Detective Wendling's notes:

> EDEN said when he came to jail they asked him to squat and cough and he would not do it.  EDEN said he doesn't remember what Deputy but when he didn't comply and squat and cough that a Deputy spread his butt cheeks apart.  I asked EDEN if that was a sexual assault and he said "no, it's misconduct, they can't touch me."  I again asked EDEN if he was sexually assaulted and he said "yes" and I asked if he remembered who did it and he doesn't remember.  EDEN said it was February 17th and it was when he went from D-MAX to suicide gown.  I asked how many deputies were in the room and he said just one male Deputy and it was not a sergeant.

(ECF No. 35-18, PageID.423).  When questioned further about the alleged sexual assault at his deposition, Eden maintained that, on the day in question, only one deputy escorted

---

[5] Ten minutes before Eden sent the PREA Incident Form by kite, he submitted a grievance claiming his HIPAA rights were being violated (ECF No. 35-11, PageID.353); he later explained to his girlfriend that the HIPAA issue was nothing more than a pathway to "get PAID some REAL cash …."  (ECF No. 35-13, PageID.400 (emphasis in original); ECF No. 35-2, PageID.242).

him to the change-out room, then asked him to get undressed and squat and cough;[6] he admitted that he did not comply, claiming that the unidentified deputy then put his hands on Eden's "butt cheeks and spread them apart." (ECF No. 35-2, PageID.234). Eden also admitted, however, that the deputy did not make any sexual comments, and he has no evidence this alleged action had anything to do with sex. (*Id.*, PageID.235). After interviewing Eden, as well as Deputy Willing, Deputy Kyle Abrego, and Sergeant Darling, Detective Wendling concluded that there was insufficient evidence of sexual assault. (ECF No. 35-18, PageID.424).[7]

3. *Eden's Move to B-Pod and the Alleged Punch by Defendant Abrego*

During this same general timeframe, on March 26, 2022, Eden involved himself in a disciplinary action involving two other inmates in F-Pod, who were caught passing notes to a female pod. (ECF No. 35-35). Eden admits challenging the SCJ deputies' right to punish inmates for this action, questioning "[w]here in the rulebook does it say we can't do that?" (ECF No. 35-2, PageID.249). At that time, Lieutenant Keinath decided to transfer Eden out of F-Pod into B-Pod, documenting her reasons as follows:

---

[6] Eden admits that requiring an inmate to "squat and cough" is a normal part of a strip search (which also includes asking the inmate to lift up his tongue, arms, and private parts and show the bottoms of his feet). (ECF No. 35-2, PageID.234). These commands are designed to ensure the inmate is not hiding a weapon or contraband. (*Id.*).

[7] In his amended complaint, Eden alleges that Defendants violated his constitutional rights by not allowing him to file grievances or complaints regarding the alleged sexual assault. (ECF No. 7, PageID.37-45). The evidence establishes, however, that Eden filed five grievances in the twenty days following his PREA complaint. (ECF No. 35-11). Moreover, when questioned at his deposition about his allegation that he was denied the opportunity to file grievances, Eden said, "I don't know what that's about." (ECF No. 35-2, PageID.264). Thus, there is simply no evidence supporting this aspect of Eden's amended complaint.

> Inmate Eden will be moved to B29 for safety and security. Due to inmate Eden interfering in jail operations, abusing the inmate grievance system (which he was instructed not to do per the jail rules and Sgt Tank), and claiming discrimination and harassment (which has all proved to be false claims) he will remain in B29 for safety, and security. He will be able to come out with upper tier as scheduled.

(ECF No. 35-35, PageID.472). According to Sergeant Tank, Cell B29 is one of the few cells where cameras – which are located outside the individual jail cells – can record partial areas of the interior of the cell. (ECF No. 35-4, PageID.321). Also, B-Pod, unlike F-Pod, is directly visible to the deputy assigned to the master control room and, thus, is one of the more securely watched Pods in the SCJ. (*Id.*).

After he was moved to B-Pod, Eden continued to express fear for his safety. (ECF No. 35-2, PageID.250; ECF No. 35-38, PageID.483). As a result, on March 27, 2022, Lieutenant Keinath decided to place Eden on the "morning plan," effective the next morning. (ECF No. 35-3, PageID.317). This meant that Eden's time out of his cell, into the jail's common areas, would occur in the morning (typically between 6:00 a.m. and 9:00 a.m.) – at a time when the other B-Pod inmates remained in their cells. (*Id.*; ECF No. 35-2, PageID.250). In her affidavit, Lieutenant Keinath averred that the decision to move Eden to Cell B29, and then to place him on the morning plan, had nothing to do with Eden's PREA complaint; rather, this is a type of action normally taken "when an inmate expresses fear for [his] safety while at the jail." (ECF No. 35-3, PageID.317).

Eden alleges that, at approximately 11:00 a.m. on March 27, 2022 – the day after he was placed in Cell B29 – Defendant Abrego punched him just below his eye (he does not recall which one) because he did not move fast enough when asked to put his meal tray

outside his cell door.  (ECF No. 35-2, PageID.259-60).  According to Eden, he remembers "waking up on the ground" with a "bunch" of deputies in his cell, who "might have moved [him] somewhere."  (*Id.*, PageID.260).

In his affidavit, Defendant Abrego denies punching Eden in the eye or assaulting him in any way on March 27, 2022 (or any other date).  (ECF No. 35-8, PageID.336). Several other pieces of evidence in the record belie Eden's allegations regarding this incident.[8]  For example, although Eden alleges that the punch occurred at approximately 11:00 a.m., SCJ records show that, at 11:48 a.m., Eden called using the cell intercom, requesting to use the law library.  (ECF No. 35-39, PageID.487).  He was then taken to room 44 (the discovery room) by Defendant Abrego and given a flash drive and computer at 11:52 a.m.;[9] he admittedly stayed there until 2:32 p.m.  (*Id.*, PageID.488; ECF No. 35-2, PageID.260).  At 3:42 p.m., Eden then hit the emergency button in his cell, asking to use the law library again (he was told he was abusing the emergency button at this time).  (ECF No. 35-39, PageID.488).  At 4:14, Eden again hit his cell's emergency button because his toilet began overflowing.[10]  (*Id.*; ECF No. 35-2, PageID.261).  At 5:43 p.m., Eden asked Deputy Thompson if he was going to be allowed to have his time out with his upper floor

---

[8] The Court notes that, on at least one other occasion, Eden punched himself in the face hard enough to give himself a black eye.  (ECF No. 35-36, PageID.477; ECF No. 35-37, PageID.480).

[9] On the way to the discovery room, Eden accused Defendant Abrego of "not protecting him[,]" saying that "staff is going to get charged with a misdemeanor for their violation."  (ECF No. 35-40, PageID.494).  There is no indication that Eden accused Defendant Abrego of punching him at this time, however.

[10] It bears mentioning that Eden appears to allege in his original complaint that Defendant Abrego punched him after he soiled himself because his toilet overflowed.  (ECF No. 1, PageID.6-7).

cell mates so that he could have a video visit with his wife.  (ECF No. 35-38, PageID.483).

Eden was told that he was being put on the morning plan, so he would not be able to do so,

but he would be allowed to call his wife and explain the schedule change.  (*Id.*; ECF No.

35-2, PageID.261).  This was the first time Eden claimed that "a deputy on the morning

shift hit him under the eye."  (ECF No. 35-38, PageID.483).  Deputy Thompson examined

Eden's face but found "no marks on his face that showed if someone hit him or not."  (*Id.*).

Eden also could not identify the deputy who allegedly punched him.  (*Id.*).

At 5:55 p.m. Eden called into master control, saying he needed a doctor but refusing

to say why.  (ECF No. 35-39, PageID.490).  At 6:18 p.m., while rounding, Deputy

Alexander saw Eden lying on the floor of his cell; when other deputies responded and

called his name, Eden was not moving or responding, until someone eventually kicked his

foot, "[n]ot very hard," at which point Eden turned his head over and said "don't fucking

touch me."  (ECF No. 38-38, PageID.483; ECF No. 35-2, PageID.262).  At that point, Eden

said that he didn't feel well and that his stomach hurt; he was taken to a holding cell on the

first floor.  (ECF No. 38-38, PageID.483).  While in observation, Deputy Brooke Smith

(now Romzek) noticed that Eden had "bruises around his eye."  (ECF No. 35-42,

PageID.501).  When asked what happened to his eye, Eden "stated that he had fallen during

the day and refused to discuss it further."  (*Id.*; ECF No. 35-38, PageID.484).  Eden then

told Deputy Smith:

> … he was never actually concerned for his safety and that it was all
> an act.  At that time he apologized to [Smith] for how he had treated
> jail staff and asked [Smith] how to get himself out of the hole he dug.
> [Smith] told him the best thing to do would be to stop disrupting jail
> operations and to be respectful towards jail staff.

(ECF No. 35-42, PageID.501).   After March 27, 2022, Eden continued to attempt to manipulate the SCJ to move him to another pod.  (ECF No. 35-2, PageID.143, 145 (hunger strike), PageID.253 (admitting he "thinks he played the forensics card too much")); ECF No. 35-44 (fake suicide)).  Nevertheless, he also continued to claim he was fearful for his safety and, thus, for the most part remained in B-Pod.[11]

### B.   Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v.*

---

[11] Eden makes two other minor allegations – namely, that he was denied a blanket and mattress at one point and that he was kept in his cell for 25½ consecutive hours every other day.  (ECF No. 7, PageID.42-43).  These allegations are discussed in greater detail below, *infra* at 18-21.

*Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis

As discussed above, in its prior Opinion and Order, the District Court construed the claims raised in the amended complaint as claims that Defendants retaliated against Eden in violation of his First Amendment rights after he filed a PREA complaint.  (ECF No. 8, PageID.50).  Specifically, the Court stated:

> In short, Plaintiff claims that the named Defendants are retaliating against him for his attempt to identify, report, and pursue his claim against John Doe for the alleged sexual assault.  He asserts that Defendants did not allow him to file grievances or complaints regarding the assault (Keinath, Darling, and Tank), refused to provide information regarding the identity of John Doe (Morden), placed him in a cell not covered by security cameras (Keinath), removed his mattress and blanket from his cell (Kensley and Tank), punched him in the face (Abrego), kept him in his cell for 25½ consecutive hours every other day, and denied him visitation.

(*Id.*).  Additionally, to the extent Eden alleges that certain of these actions constituted cruel and unusual punishment, those allegations will be discussed in that context below as well.

Defendants now argue that summary judgment is warranted on all of Eden's claims.

      *1.    Eden's Retaliation Claims*

          *a.    Applicable Legal Standards*

A prima facie case of First Amendment retaliation involves three elements: (1) the plaintiff participated in constitutionally-protected activity; (2) the defendant took an adverse action against the plaintiff likely to "deter a person of ordinary firmness" from continuing to engage in the protected conduct; and (3) there is a causal connection between elements one and two – that is, "the adverse action was motivated at least in part by [the plaintiff's] protected conduct." *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

To prove his claim, Eden must be able to establish that his protected activity was the substantial and motivating factor behind the defendant's alleged retaliatory conduct:

> As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim.
>
> To prevail on such a claim, a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury. It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured – the motive must *cause* the injury. Specifically, it must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves v. Bartlett*, ___ U.S. ____, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks and brackets omitted) (emphasis in original).

Where prison officials can show that the action would have occurred even if the plaintiff had not engaged in protected activity, there is an absence of "but for" causation and there is no valid claim of retaliation.  *See Lemaster v. Lawrence Cty., Ky.*, 65 F.4th 302, 310 (6th Cir. 2023).  Moreover, courts generally must defer to the judgment of prison administrators who are charged with and trained in the running of the particular institution under examination, and should avoid second guessing those decisions except where the decisions violate the Constitution or a statute.  *See Bell v. Wolfish*, 441 U.S. 520, 561-562 (1979).

In this case, Eden's retaliation claims stem from the filing of a PREA complaint, which clearly constitutes protected activity sufficient to meet the first prong of a retaliation claim.  *See, e.g., McLaurin v. Kabat*, No. 23-11212, 2023 WL 5939820, at *4 (E.D. Mich. Sept. 12, 2023) ("Filing grievances and complaints is indisputably protected conduct.") (citing *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010)).  And, for purposes of their summary judgment motion, Defendants effectively concede that at least some – if not all – of the alleged retaliatory actions at issue constitute adverse action.  (ECF No. 35, PageID.193).  Thus, the salient question is whether Eden has raised a genuine issue of material fact as to causation, that is, whether each defendant's challenged conduct was motivated by Eden's filing of the PREA complaint.  Defendants argue that Eden cannot establish this causal connection and that, in any case, their actions were reasonably related to legitimate penological concerns.

### b.   *Eden's Claim Against Sergeant Morden*

In his amended complaint, Eden alleges that Sergeant Morden refused to provide

14

information regarding the identity of John Doe, the SCJ employee who allegedly sexually assaulted him during the change-out on February 18, 2022.  (ECF No. 7, PageID.38-39; ECF No. 8, PageID.50).  Specifically, Eden claims that when he requested names and information from "all the times [he] was placed on suicide watch … Morden responded 'it was 11/20/20 and 12/26/2021' leaving out the time [he] was dressed out and sexually assaulted."  (ECF No. 7, PageID.39).  However, Eden's claim that Morden refused to provide him with the information requested in retaliation for his PREA complaint necessarily fails, as Eden admittedly requested the information on March 20, 2022, and a response was provided on that date,[12] which was *before* he filed his PREA complaint on March 22, 2022.  (*Id.*; *see also* ECF No. 35-22).  Thus, even assuming that, on March 20, 2022, Morden deliberately failed to provide Eden with the date on which he was changed out in February 2022, this necessarily could not have been in retaliation for Eden's filing of the PREA complaint, as that had not yet occurred.  As this is Eden's only claim against Sergeant Morden, summary judgment should be granted in Morden's favor.

   c. *Eden's Claim that He Was Not Allowed to File Grievances or Complaints Regarding the Alleged Sexual Assault*

   As set forth above, Eden's amended complaint has been construed as asserting a claim that Lieutenant Keinath, Sergeant Darling, and Sergeant Tank did not allow him to file grievances or complaints regarding the alleged sexual assault.  (ECF No. 8, PageID.50).

---

[12] In addition to providing Eden with the dates in 2020 and 2021, Sergeant Morton further indicated, "[y]ou would have to have your attorney FOIA records and copies of reports or CMH evaluations."  (ECF No. 35-22).  He also asked Eden "[a]re there specific requests you want like requesting CMH or medical or what types of things?"  (*Id.*).  Eden never responded to this inquiry.  (ECF No. 35-2, PageID.246-47).

This is based on the following allegations in the amended complaint:

> On 3/19/22 @ 1:26 p.m. I asked to make a police report.  Darling asked "concerning what?"  I responded that I was to [sic] afraid to tell anyone inhouse.  Keinath ended the conversation on the cidnet grievance tracker with, "I will be up to speak with you shortly."  It should be noted she did not come speak with me until 4 days later.

> \*       \*       \*

> On 3-22-22 @ 10:28 a.m. I submitted a PREA incident form reporting a misconduct.  I stated "to [sic] afraid to put in a form.  [P]lease keep me in F pod where there are cameras & people to witness my safe being.  I've asked to speak with the Mich. State police & am repeatedly denied."  Sargent [sic] Tank responded, "what do you mean you are afraid of submitting forms" & "there are inmates & cameras in all of our areas to record you."  [A] couple hours later Sgt. Tank denied my out going message at 3/22/22 @ 2:46 p.m. denying my right to free speech & it was a [sic] no doubt out of retaliation.

(ECF No. 7, PageID.38-40).

Eden's vague allegations cannot create a question of fact sufficient to overcome Defendants' summary judgment motion when all of the record evidence is to the contrary. To begin with, the evidence demonstrates that Eden filed 41 separate grievances while in the SCJ.  (ECF No. 35-11).  In fact, between the time of the alleged sexual assault (on February 18, 2022) and the submission of his PREA complaint (on March 22, 2022), Eden filed eleven grievances.  (*Id.*).  In the 20 days after he filed his PREA complaint, Eden filed five more grievances.  (*Id.*).  Thus, on its face, Eden's allegation that he was prevented from filing grievances makes little sense.  And, most tellingly, when asked at his deposition about the claim that he was denied the opportunity to file grievances, Eden stated, "I don't know what that's about."  (ECF No. 35-2, PageID.264).

16

With respect to Eden's related allegation that he "asked to make a police report[,]" he made that request on March 19, 2022.  (ECF No. 35-24, PageID.448).  Sergeant Darling responded by asking "[c]oncerning what?" to which Eden responded, "I am afraid to tell anyone in house[.]"  (*Id.*).  At that point, another (non-party) SCJ staff member (T. Herbert) said: "I advised you to write a letter regarding your concerns to a road patrol Sergeant, and further action can be taken that way if deemed necessary."[13]  (*Id.*).  All of this communication occurred *before* Eden filed his PREA complaint on March 22, 2022, and, thus, there can be no causal connection between the filing of that complaint and the alleged denial of Eden's request to file a police report.

Finally, as to Eden's allegation that Sergeant Tank retaliated against him for filing the PREA complaint by holding up an outgoing message on March 22, 2022, Sergeant Tank explained – and Eden did not contest – that the SCJ's electronic messaging system (CIDNET) flags certain words in e-messages and holds the messages until they are reviewed and released by jail staff.  (ECF No. 35-4, PageID.322).  Eden's message, which was time-stamped 1:46 p.m., included the words "suicidal," "threat," and "security" (ECF No. 35-13, PageID.396).  It was "approved" less than 48 hours later.  (*Id.*).  Moreover, an identical message sent at 4:23 p.m. on March 22, 2022, had to be (and was) approved by a deputy at 4:44 p.m. that same day, further demonstrating that the message in question was

---

[13] Moreover, when Eden responded to Herbert's message on March 23, 2022 (the day after filing his PREA complaint) by stating, "The problem with that is that it needs to be out of house, as i [sic] have sargents [sic] as complaining witnesses[,]" Lieutenant Keinath responded a few hours later, saying, "I will be up to speak with you shortly."  (ECF No. 35-24, PageID.448).  Thus, even after Eden filed his PREA complaint, Lieutenant Keinath responded to his continued requests regarding this issue.

held up pursuant to policies for use of the CIDNET system, not a jail official's retaliatory motive. (*Id.*, PageID.397). In short, Eden failed to present evidence sufficient to raise a material question of fact that the temporary delay in the release of his e-message was retaliatory in nature.

For all of the above reasons, summary judgment is appropriate on these aspects of Eden's retaliation claim.

### d.    Eden's Claim Regarding His Mattress and Blanket

Eden also alleges that Sergeants Tank and Kensley removed his blanket and mattress from his cell in retaliation for his filing the PREA complaint. (ECF No. 7, PageID.42). It is undisputed that while Eden was in B-Pod, he claimed to be suicidal or engaged in self-harm on multiple occasions. On May 15, 2022, he was placed on suicide watch after he cut his wrists with a razor (three shallow, non-life-threatening cuts). (ECF No. 35-51, PageID.529; ECF No. 35-2, PageID.255). On that date, he complained about being denied a blanket and mattress; he was told by Defendant Tank that, per CMH, he was allowed only clothes and a mat, and that denial of the blanket and mattress was protocol to ensure his safety, not punishment. (ECF No. 35-4, PageID.322). A few days later, on May 20, 2022, Eden punched the window and, when deputies tried to restrain him, he "just kept screaming to taze him." (ECF No. 35-53, PageID.547). He was again told that he could not have his property back "due to his erratic behavior and threats of self harm[.]" (ECF No. 35-55, PageID.554).

Thus, while Eden was denied a mattress and blanket, it was only on a temporary basis, and only because of his erratic behavior and threats of self-harm. (ECF No. 35-55,

PageID.553-54).  As Sergeants Tank and Kensley both averred in their affidavits, when an inmate threatens self-harm, jail officials follow the advice of CMH as to what the inmate is allowed; in Eden's case, removal of the blanket and mattress was a safety measure, not punishment.  (ECF No. 35-4, PageID.322; ECF No. 35-7, PageID.333).  The mattress and blanket were returned to Eden later the same day.  (ECF No. 35-55, PageID.555).  Eden has come forward with no evidence suggesting a different, retaliatory reason for these actions.  As such, he failed to raise a material question of fact on this aspect of his retaliation claim, and summary judgment is warranted in Defendants' favor.

> e.     *Eden's Claim that He Was Moved to a Cell Without a Camera*

Eden also alleges in his amended complaint that Lieutenant Keinath retaliated against him for filing a PREA complaint by placing him in Cell B29, a cell not covered by security cameras.  (ECF No. 7, PageID.41).  This claim lacks merit.  First and foremost, none of the individual jail cells at the SCJ – other than those in D-Max – have cameras located within the cell itself; rather, there are cameras outside the cells that cover an entire pod.  (ECF No. 35-4, PageID.321).  Thus, the move at issue – from a cell in F-Pod to a cell in B-Pod – did not result in depriving Eden of an in-cell camera.

Moreover, it is undisputed that, during the relevant timeframe, Eden repeatedly claimed that he was fearful for his safety.[14]  (ECF No. 35-2, PageID.250; ECF No. 35-24;

---

[14] In his response briefs, Eden repeatedly claims that he was afraid of SCJ *deputies*, not other inmates, and that this is why he was requesting to be kept on camera.  (ECF No. 37, PageID.560; ECF No. 39, PageID.583).  However, in his PREA complaint, Eden simply requested to be kept "where there are cameras and people to witness my safe being."  (ECF No. 35-12).  Even viewed in the light most favorable to Eden, such a request cannot reasonably be interpreted as an expression of fear of deputies rather than other inmates.

ECF No. 35-33; ECF No. 35-38, PageID.483).   For this reason, and because Eden

interfered in a disciplinary action involving two other inmates in F-Pod on March 26, 2022,

*see supra* at 7, Lieutenant Keinath made the decision to transfer Eden out of F-Pod and

into another medium security pod (B-Pod).   Lieutenant Keinath documented her reasons

for this transfer as follows:

> Inmate Eden will be moved to B29 for safety and security.   Due to
> inmate Eden interfering in jail operations, abusing the inmate
> grievance system (which he was instructed not to do per the jail rules
> and Sgt Tank), and claiming discrimination and harassment (which
> has all proved to be false claims) he will remain in B29 for safety, and
> security.   He will be able to come out with upper tier as scheduled.

(ECF No. 35-35, PageID.472).

In her affidavit, Lieutenant Keinath further averred that the decision to move Eden

to Cell B29 had nothing to do with Eden's PREA complaint; rather, this type of action is

normally taken "when an inmate expresses fear for their safety while at the jail." (ECF No.

35-3, PageID.317).   And, moving Eden to Cell B29, a cell that is partially visible by the

outside cameras and in a pod directly observable from the master control room, is

consistent with a desire to ensure Eden's "safety and security," as Lieutenant Keinath

averred.   (ECF No. 35-35, PageID.472).   Eden has come forward with no evidence that

Lieutenant Keinath's action in this respect was related to his PREA complaint, let alone

undertaken in retaliation for that complaint.   Rather, the only evidence is that Lieutenant

Keinath's action was part of the normal protocol that applies when an inmate claims to be

fearful for his or her safety.   Having failed to raise a material question of fact, this aspect

of Eden's retaliation claim also fails.

*f.*     *Eden's Claim that He Was Kept in His Cell for 25½ Hours*

Finally, Eden asserts that, after he was eventually moved off the morning plan, he was confined to his cell for 25½ hours at a time every other day, which has been construed as an allegation that this was done in retaliation for his PREA complaint.  (ECF No. 8, PageID.50).  At his deposition, however, Eden admitted that this was the normal process for all inmates because the SCJ rotated time out in each pod.  (ECF No. 35-2, PageID.250). For example, in B-Pod, half of the inmates would be let out in the afternoon for 2-3 hours, and when they went back to their cells, the other half would be let out for 2-3 hours; the next day, it would reverse.  (*Id.*, PageID.250).  As a result, the group let out first one day would not be let out again for a period of 25 hours, but the other group would have a gap of only 17 hours, and then the process would reverse.  (*Id.*).  In other words, as Eden admitted at his deposition, everyone in B-Pod was treated the same in this respect, and he was not singled out for a retaliatory reason.  (*Id.*, PageID.263).  Thus, this aspect of Eden's retaliation claim also fails.

For the foregoing reasons, summary judgment should be granted on all of Eden's First Amendment retaliation claims.

2.     *Eden's Cruel and Unusual Punishment Claims*

Eden also appears to assert two different cruel and unusual punishment claims[15] –

---

[15] Again, although Eden references the Eighth Amendment in his complaint when alleging cruel and unusual punishment (ECF No. 1, PageID.1), such a claim should have been brought under the Fourteenth Amendment, as Eden was a pretrial detainee at the time of the events in question.  *See Blackmore*, 390 F.3d at 895 (6th Cir. 2004).  Thus, the Court will analyze these claims under Fourteenth Amendment principles.

the alleged sexual assault by Defendant John Doe, and the alleged punch in the eye by Defendant Abrego.  Each of these claims is analyzed below.

        *a.     Eden's Sexual Assault Claim Against Defendant John Doe*

In his complaint, Eden alleges that he was "sexually assaulted" by a John Doe defendant during the "change out" that occurred in mid-February 2022.  (ECF No. 1, PageID.5).  However, even if Eden could identify and name this John Doe defendant, which he so far has failed to do, the evidence is that the purported "sexual assault" was nothing more than touching that occurred during the course of a normal strip search.  (ECF No. 35-2, PageID.234).  Specifically, when questioned about the alleged sexual assault at his deposition, Eden testified that, during the change out, he was asked to get undressed and then to squat and cough.  (*Id.*).  He acknowledged that requiring an inmate to "squat and cough" is a normal part of a strip search, designed to ensure that the inmate is not hiding a weapon or contraband.  (*Id.*).  Eden admitted that he did not properly comply with the commands he was given, at which point he claims John Doe put his hands on Eden's "butt cheeks and spread them apart."  (*Id.*).  Eden admitted that John Doe did not make any sexual comments, and Eden presented no evidence suggesting that the alleged actions had anything to do with sexual gratification by the John Doe defendant.  (*Id.*, PageID.235).

Considering these facts in light of the applicable law, even if Eden had identified the John Doe defendant, summary judgment should be granted on this aspect of Eden's cruel and unusual punishment claim.  Courts have recognized that prisoners may be strip-searched under circumstances that are reasonably related to the legitimate penological interest of security and order.  *See Roden v. Sowders*, 84 F. App'x 611, 612-13 (6th Cir.

2003).  In considering whether a particular search is reasonable, courts balance the prison's need for the search with the "invasion of personal rights that the search entails." *Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 530 (6th Cir. 2016) (internal quotation marks omitted).  Specifically, courts consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted, while also examining obvious, easy alternatives that accommodate the inmate's privacy interests at little cost to penological objectives. *Id.*  Notably, "'detect[ing] and deter[ing] the possession of contraband' is a legitimate penological objective." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 573 (6th Cir. 2013) (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012)).

In this case, the strip search at issue was conducted in a private change-out room, as a result of Eden's report that he might engage in self-harm, and Eden admitted that he did not fully and properly comply with orders to "squat and cough" during this search.  (ECF No. 35-2, PageID.234).  It was only then that John Doe allegedly put his hands on Eden's "butt cheeks and spread them apart."  (*Id.*).  Such actions, which Eden admits were not accompanied by any sexual comments, and which were designed to ensure that he was not hiding some kind of weapon or contraband with which he might harm himself or others, furthered a legitimate penological objective and therefore cannot be said to constitute cruel and unusual punishment. *See Williams v. Melvin*, No. 23-12868, 2024 WL 310185, at *3 (E.D. Mich. Jan. 26, 2024) (plaintiff's allegation that corrections officer "lifted his testicles and ordered him to bend over and spread during a brief, isolated strip-search" does not constitute cruel and unusual punishment); *Lee v. Winn*, No. 20-12480, 2023 WL 8264524,

23

at *2 (E.D. Mich. Oct. 25, 2023) (summary judgment granted in favor of corrections officer who took plaintiff into the bathroom for a strip search; ordered him to lift his testicles, squat and cough; and then forcefully spread plaintiff's buttocks apart to perform the search).  As such, summary judgment should be granted as to this aspect of Eden's cruel and unusual punishment claim.

### b.      *Eden's Physical Assault Claim Against Defendant Abrego*

Finally, Eden alleges in his amended complaint that, on March 27, 2022, "Deputy C. Abrego came into [his] cell, B-29 and punched [him] in the face."  (ECF No. 7, PageID.41).  In their motion, Defendants argue that summary judgment is warranted on this claim because (1) no rational juror could find in Eden's favor given the evidence of record, and (2) neither the force administered, nor the injury suffered, was more than *de minimis*.  (ECF No. 35, PageID.200-08).  Each of these arguments is discussed below.

### (1)      A Rational Juror Could Find in Eden's Favor

As set forth above, summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law."  *Anderson*, 477 U.S. at 248.  In determining whether a genuine issue of material fact exists, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage.  *Anderson*, 477 U.S. at 249.  The ultimate question for the court to determine "is whether the evidence presents a sufficient factual disagreement to require submission of

the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 251-52).

Before addressing the issue of whether Eden's claim that Defendant Abrego's alleged punch constituted cruel and unusual punishment under the applicable legal principles, Defendants first argue that summary judgment is appropriate on this claim because no reasonable juror could believe that this punch even occurred, as Eden alleges. To begin with, Defendants acknowledge Eden's deposition testimony that Defendant Abrego punched him in the eye at approximately 11:00 a.m. on March 27, 2022, apparently because he didn't put his meal tray outside his cell door quickly enough.  (ECF No. 35-2, PageID.259-60).  Indeed, when defense counsel attempted to pick apart the inconsistencies in Eden's account of this incident – which will be discussed below – Eden clearly stated: "I'm going to say it one more time.  Deputy Abrego punched me in my eye. … I'm positive."  (*Id.*, PageID.263).

In an effort to discredit Eden's deposition testimony, Defendants highlight several pieces of evidence, which they claim so contradict his version of the events "that no reasonable juror could believe his claim that he was punched in the eye by Deputy C. Abrego, as he claimed."  (ECF No. 35, PageID.203).  Specifically, Defendants assert that:

- Eden has now presented three different versions of the event in question. Specifically, in contrast to his deposition testimony discussed above (which is one version), Eden told Detective Wendling – during the March 31, 2022 interview regarding his PREA complaint – that Defendant Abrego punched him in the eye because he had "cracked a joke earlier in the day about how ugly he was …."  (ECF No. 35-18, PageID.423).  And, when examined by Deputy Smith on March 27, 2022, the day of the alleged punch, Eden

25

presented a third version – stating "that he had fallen during the day and refus[ing] to discuss it further." (ECF No. 35-42, PageID.501). Thus, there are inconsistencies even in Eden's own version of the incident in question.

- Defendants also point out that Eden "has a history of punching himself in the eye sufficient to give himself a black eye." (ECF No. 35, PageID.203). Indeed, Eden admittedly did so "once, maybe twice" during his time at the SCJ. (ECF No. 35-2, PageID.254). One of these occasions admittedly was on April 28, 2022, when he "started going crazy" and punched himself in the face hard enough to give himself a black eye. (*Id.*, PageID.253-54). Defendants contend, then, that the second occasion on which Eden could have given himself a black eye likely was on the date he now claims he was punched by Defendant Abrego.

- Defendants also note that, at his deposition, Eden testified he was punched at approximately 11:00 a.m. and that he remembered "waking up on the ground" with "a bunch of police … or deputies being in [his] cell." (*Id.*, PageID.260). The problem with this timeline, however, is that Eden was not found lying on the floor of his cell until 6:18 p.m., more than seven hours after the alleged punch occurred. (ECF No. 38-38, PageID.483). And, in the interim, Eden engaged in several other activities, including asking to use the law library, reviewing discovery in his criminal case for three hours, hitting the emergency button to report that his toilet was overflowing, and, at 5:43 p.m., asking Deputy Thompson if he was going to be allowed a video visit with his wife that day.[16] (ECF No. 35-38, PageID.483; ECF No. 35-39, PageID.487-88). According to Defendants, all of these activities – which took place between 11:00 a.m. and 6:18 p.m. – cast doubt on Eden's claim that Defendant Abrego punched him, as alleged.

Citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), Defendants argue that this case presents one of those "rare circumstances" where Eden's testimony is so "contradictory and incomplete" that it is "impossible" for this Court to determine whether there are any genuine issues of material fact without making some assessment of

---

[16] It was during this conversation that Eden first claimed that "a deputy on the morning shift hit him under the eye." (ECF No. 35-38, PageID.483). At that time, Deputy Thompson examined Eden's face and found "no marks on his face that showed if someone hit him or not." (*Id.*). Eden also could not give Deputy Thompson the name of the deputy who allegedly punched him. (*Id.*).

the credibility of his account.   (ECF No. 35, PageID.202) (internal quotation marks omitted).   The Court is not persuaded by this argument.   In *Jeffreys*, and in the cases on which it relied, the court was faced with a summary judgment record where the plaintiff "relie[d] almost exclusively on his own testimony, much of which [was] contradictory and incomplete" and there was an "absence of any corroborating evidence in the record …." *Id.*   Here, while Eden's statements and deposition testimony are somewhat inconsistent, and at odds with certain contemporaneous SCJ records, there is *some* evidence corroborating his assertion that Defendant Abrego punched him in the eye on March 27, 2022, as later that same day, Deputy Smith observed bruising around Eden's eye and provided him with ice to treat the swelling.   (ECF No. 35-38, PageID.484; ECF No. 35-42, PageID.501).   Thus, the cases cited by Defendants are inapposite.   While the inconsistencies in Eden's various accounts are troubling, as is the fact that he engaged in a slew of apparently routine activities after allegedly being punched in the face hard enough to suffer a black eye, the Court cannot say that the evidence is "so one-sided that the moving part[y] should prevail as a matter of law." *Payne*, 767 F.3d at 530.   Indeed, there appears to be a potential inconsistency between Deputy Thompson's determination that Eden had "no marks on his face that showed if someone hit him or not," and Deputy Smith's observations that Eden had bruising and swelling around his eye.   Therefore, construed in the light most favorable to Eden, and setting aside the issue of credibility, a genuine issue of material fact exists as to whether Defendant Abrego punched Eden in the face, sufficient to cause a black eye, on March 27, 2022.

(2)    The Alleged *De Minimis* Nature of the Punch and Injury

Defendants also argue, in the alternative, that summary judgment is warranted on Eden's Fourteenth Amendment cruel and unusual punishment claim against Defendant Abrego because the alleged use of force was *de minimis*, as was the alleged injury.  (ECF No. 35, PageID.205-08).  Again, however, the Court disagrees.

While the Eighth Amendment prohibits cruel and unusual punishment against those convicted of crimes, Eden's rights instead derive from the Fourteenth Amendment, as he was a pretrial detainee at the time of the events in question.  *See Blackmore*, 390 F.3d at 895.  A detainee's claim differs from that of a prisoner because "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 n. 40 (1977)).

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment."  *Graham v. Conner*, 490 U.S. 386, 295 n. 10 (1989).  Unlike a convicted prisoner, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97.  While recognizing that the "appropriate standard for a pretrial detainee's excessive force claim is solely an objective one[,]" the *Kingsley* court also noted that "objective reasonableness turns on the facts and circumstances of each particular case."  *Id.* at 397.  It further noted the following non-exhaustive list of considerations that may bear on the reasonableness or unreasonableness of the force used:

> … the relationship between the need for the use of force and the
> amount of force used; the extent of the plaintiff's injury; any effort
> made by the officer to temper or to limit the amount of force; the
> severity of the security problem at issue; the threat reasonably
> perceived by the officer; and whether the plaintiff was actively
> resisting.

*Id.*

Ultimately, in evaluating a cruel and unusual punishment claim under the Fourteenth Amendment, the court's focus is not on the extent of the plaintiff's injury, but on "whether gratuitous violence has been inflicted." *Coley v. Lucas Cty.*, 799 F.3d 530, 539 (6th Cir. 2015).

Applying these legal standards to the facts of this case, a genuine issue of material fact exists as to whether Defendant Abrego's action – in allegedly punching Eden in the face without justification, causing bruising and swelling significant enough to require medical attention – violated the Fourteenth Amendment.  Taking the facts in the light most favorable to Eden, there can be little doubt that an unprovoked punch to the face is an "objectively unreasonable" use of force against a non-resisting inmate, *Kingsley*, 576 U.S. at 396-97, and constitutes the infliction of "gratuitous violence," *Coley*, 799 F.3d at 539. Again, viewing the facts in the light most favorable to Eden, he posed no threat to Defendant Abrego and was punched simply because he did not slide his meal tray outside his cell door quickly enough for Defendant Abrego's liking.

Where there was no threat to Defendant Abrego, then, no amount of force was necessary, and any force applied was arguably done gratuitously.  In such situations, courts have found the evidence sufficient to establish a genuine issue of material fact as to whether

the force used violated the Fourteenth Amendment.  *See, e.g., Younger v. Gross*, No. 20-878, 2023 WL 2433363, at *7 (W.D. Pa. Mar. 9, 2023) (material question of fact existed as to whether defendants' actions, in punching plaintiff, tackling him, tasing him, and putting him in restraint chair constituted excessive force against pretrial detainee); *Knighten v. Tulsa Cty. Sheriff's Office*, No. 21-CV-0186-CVE-JFJ, 2022 WL 3569001, at *4-5 (N.D. Okla. Aug. 18, 2022) (denying motion to dismiss Fourteenth Amendment claim where pretrial detainee, who had two broken ankles, alleged that sheriff's deputy tasked with transporting him to the hospital intentionally dumped him out of his wheelchair because he believed he was faking his injuries); *Jacobs v. Cumberland Cty.*, 8 F.4th 187, (3d Cir. 2021) (denying summary judgment where a reasonable jury could find that corrections officer used excessive force against pretrial detainee plaintiff, who was handcuffed and compliant, when he delivered a strike to the plaintiff's neck and a punch to his face).  Thus, a genuine issue of material fact exists as to whether Defendant Abrego's actions violated the Fourteenth Amendment.[17]

For all of these reasons, summary judgment should be denied with respect to Eden's claim that Defendant Abrego violated his Fourteenth Amendment rights by punching him

---

[17] Defendants also argue that summary judgment is appropriate because Eden's alleged injury was *de minimis*.  (ECF No. 35, PageID.205-08).  As the *Knighten* court concisely summarized, however, the *de minimis* principle "does not carry the weight defendants place upon it."  *Knighten*, 2022 WL 3569001, at *5.  This is because the "extent of any resulting injury from the use of allegedly excessive force is only one factor in the *Kingsley* analysis."  *Id.*  Here, where Eden asserts that Defendant Abrego had no objectively reasonable basis to use any force against him, and where there is evidence in the record of a verifiable physical injury hours after the alleged punch occurred, the fact that Eden's injury might have been more serious does not warrant summary judgment.

in the face.[18]

## III.    CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(ECF No. 35)** be **DENIED IN PART**, as to Eden's Eighth Amendment claim against Defendant Abrego, and **GRANTED IN PART** in all other respects.

Dated: April 15, 2024                     s/David R. Grand
Ann Arbor, Michigan                     DAVID R. GRAND
                                        United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections

---

[18] Lastly, Defendants argue that Eden's claims for injunctive relief should be denied as moot. (ECF No. 35, PageID.208). In his amended complaint, which he filed when he was housed at the SCJ, Eden asked the Court to enter an order that he "be transferred to another jail or unit with cameras to watch me when I sleep." (ECF No. 7, PageID.45). However, Eden has since been transferred to the MDOC, where he is serving the rest of his sentence. *See* https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=358966 (last accessed April 15, 2024). Thus, his claim for injunctive relief against the Defendants is moot and should be dismissed. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (holding that prisoner's claim for injunctive relief related to a particular facility was mooted by his transfer to a new one).

which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 15, 2024.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager